## McELVAIN *vs.* MUDD, Adm'r.

[ACTION ON PROMISSORY NOTE FOR THE PURCHASE-MONEY OF SLAVES SOLD IN
THIS STATE IN FEBRUARY, 1864.]

1. *Promissory note made in this State in 1864 not invalid for want of stamp; such note should be stamped at any time up to January 1st, 1867.*—A promissory note made in this State, in the year 1864, without an internal revenue stamp, there being then no collection district established here at that time, is not invalid for want of such stamp, but by virtue of section nine, of the internal revenue act of the 13th of July, 1866, such note may have a stamp affixed thereto, by any one having an interest therein, at any time before the 1st day of January, 1867, and after being so stamped, is as valid and admissible in evidence as though it had been stamped at the time it was made.
Whether without being so stamped, it could be used as evidence, Quere.

2. *Promissory note for purchase-money of slaves; sufficient consideration to support, notwithstanding emancipation proclamation, when contract of sale was bona fide, and made between citizens of the rebel States after the proclamation and before the suppression of the rebellion.*—Notwithstanding the proclamation of the president of the United States, of the 1st day of January, 1863, known as the emancipation proclamation, there continued an uncertain contingent interest and property in slaves, which was a sufficient consideration to sustain contracts, made in good faith, in the rebel States, and between citizens of the said States, contracting with each other, in relation to that species of property, between the date of said proclamation, and the suppression of the rebellion, or the end of the war—consequently, a sale of slaves, made in good faith, in this State, between citizens thereof, between those periods, is a valid sale, and a promissory note made to secure the purchase-money, is a valid note, supported by a sufficient consideration, and may be recovered upon in the courts of this State.—(PETERS, J., *dissenting.*

3. *Ordinance No. 38, of convention of 1867, 3d section of; unconstitutionality of.*—The third section of the ordinance, No. 38, of the convention of this State, passed the 6th of December, 1867, entitled "An ordinance concerning the validity of contracts, where the consideration was Confederate bonds or currency, and for the purchase of slaves," is in conflict with Article I, section 10, part 1, of the constitution of the United States, that declares, "No State shall pass any law impairing the obligation of contracts," and is, therefore, unconstitutional and void.— (PETERS, J., *dissenting.*)

APPEAL from the Circuit Court of Shelby.
Tried before Hon. JOHN HENDERSON.

McElvain v. Mudd, Adm'r.

This case was submitted on written agreements of the parties, at the June term, 1869, and has been held under advisement until the present term.

The suit originated and was commenced in the circuit court of Jefferson county.

The appellee was the plaintiff in that court, and being the presiding judge of said court, was not competent to try the case, and the appellants not being willing that the case should be tried by an attorney of the court, under section seven hundred and fifty-eight of the Revised Code, and both parties being desirous to have the case tried before a circuit judge of the State, the same was, by the written agreement of the parties, transferred for trial to the circuit court of Shelby county, where a trial was had before a jury, who returned a verdict for the plaintiff, for the sum of seven thousand and fifty-four dollars, and, thereupon, the court rendered judgment in his favor for that sum.

The suit was brought on a promissory note, dated the first day of February, in the year one thousand eight hundred and sixty-four, payable to the plaintiff, as the administrator of the estate of James A. Mudd, deceased, three years from the date thereof, with interest from date, at the rate of eight per cent. per annum. The transcript does not show what pleas, if any, were filed by the defendants.

On the trial, a bill of exceptions was signed and sealed, at the instance of the defendants; so much of which, as is necessary for the purposes of this opinion, states that the plaintiff offered to read the said note as evidence to the jury, to which the defendants objected, because it was not stamped at the time it was executed, and not until the sixth day of December, 1866, when the stamps were affixed and cancelled by the plaintiff himself, without the knowledge of the defendants. The court overruled the objection, and the note was read to the jury; the note being read to the jury, the plaintiff rested his case.

The defendants then proved that said note was given for three negro slaves, sold by plaintiff, as administrator as aforesaid, and purchased by Wallace S. McElvain, one of the defendants, on the said first day of February, 1864.

The defendants further proved, that said James A. Mudd died intestate, the latter part of July, 1863, in said county of Jefferson, where he resided at the time of his death, and that letters of administration on the estate of said intestate were granted to the said plaintiff on the — day of September, 1863, by the probate court of said county of Jefferson. Upon this, which the bill of exceptions states, was all the evidence, the defendants asked the court to charge the jury, that if they believed the evidence to be true, then they must find for the defendants, which charge the court refused, and the defendants excepted.

An appeal has brought the case to this court, and the appellants have assigned the following errors :

1. The court erred in allowing the note to be read in evidence.

2. The court below erred in the refusal to charge, as asked by the defendants, and in rendering judgment against the defendants.

3. The court erred, as stated in the bill of exceptions.

W. S. MUDD, *pro se.*
ALEX. WHITE, *contra.*

This case was elaborately argued at the bar by the counsel of the parties in this cause, and by other eminent counsel having similar causes before the court. Mr. White, for appellee, filed a printed brief, which has been since withdrawn by him. The opinion of the court, and the dissenting opinion of Justice Peters, present the law and the argument on both sides of the cause; otherwise, notwithstanding the length of the briefs and the opinions, and a want of space, the Reporter would set out the briefs in full.

PECK, C. J.—(After stating the facts as above.)—1. There was no error in permitting the note to be read in evidence to the jury, although it was not stamped at the time it was executed. The internal revenue laws were not in operation in this State at that time, nor had the government of the United States, then, made any provision for their enforcement here, by establishing a collection

McElvain v. Mudd, Adm'r.

district, and by the appointment of internal revenue officers for that purpose. If appointed, they were not here, and could not be here, for the reason that this State was then in the military possession of the rebel government. No stamps were here, nor could they be obtained; and, besides, if they had been here, or could have been obtained, the rebel authorities would not have permitted them to be used. For these reasons it was not then necessary to stamp promissory notes to give them validity, or to authorize them to be used as evidence; and, further, I hold that the note, in this case, would have been admissible, if no stamp had, afterwards, been put upon it. Whether this be so or not, § 9 of the internal revenue act, of the 13th July, 1866, provides that, in all cases where a party has not affixed the stamp required by law, upon any instrument made, signed or issued, at a time when, and at a place where, no collection district was established, it shall be lawful for him, or them, or any person having an interest therein, to affix the proper stamp thereto, prior to the 1st day of January, 1867. That was done in this case, and, consequently, the objection to the admissibility of the note was properly overruled. We will take notice that there was no collection district in this State at the date of this note.

2. The evidence set out in the bill of exceptions, and the charge asked by the defendants, and refused by the court, raise the question as to the validity of the note sued on; that is, whether it has any legal consideration to sustain it, being given for slaves sold by the plaintiff, and bought by the defendants, after the first day of January, 1863—the date of the proclamation of the president of the United States, commonly known as the emancipation proclamation.

3. This question makes it necessary for us to consider two other questions, to-wit: 1st. The question as to the force and legal effect of said proclamation, upon contracts based upon the sale of slaves in this State, after the date of said proclamation, and before the suppression of the rebellion, then prevailing in this and other slave States, against the government of the United States; and, 2d. The

validity and constitutionality of the ordinance of the convention of the people of this State, passed December 6th, 1867, entitled "An ordinance concerning the validity of contracts, where the consideration was Confederate bonds or currency, and for the purchase of slaves."

As to the first question, I do not propose to go into an elaborate discussion of the abstract right, or morality of the institution of slavery, as it existed in this country before the date of said proclamation. To do so, I am persuaded will accomplish no good purpose, and, most probably, we would come out of such a discussion but little wiser, and, I think, certainly no better, than when we entered upon it.

I shall, therefore, content myself by doing little more than to state, that slavery existed in this country certainly up to the date of said proclamation, and had been uniformly recognized as a lawful institution by all the departments of the federal government, legislative, executive and judicial, from the adoption of the constitution of the United States.

The two acts of congress passed, the one in 1793, and the other in 1850, commonly called the fugitive slave acts, are recognitions, on the part of the legislative and executive departments of the government, of the legal existence of slavery in this country.

It is true, the words "slave" or "slavery," are not named in said acts; but no one who knows anything about the history of these acts, and the reasons why they were passed, is so ignorant as not to know, that their object and purposes were to authorize and enable the owners to recover their fugitive slaves, who should escape from their service, and flee into a State where slavery did not exist.

As to the judicial department of the government, it is only necessary to refer to a single case, in the courts, to show that the highest court in the nation has, in the fullest manner, and on the most mature deliberation, recognized and admitted the legal existence of slavery, in what were known as the slave States, and that slaves were property. I refer to the celebrated case of *Prigg v. The Commonwealth of Pennsylvania*, 16 Peters Rep. 539. In that case, Prigg, the plaintiff in error, had recaptured a slave named Mar-

garet, a fugitive, from her mistress, and had carried her back to Maryland, the State from which she had escaped, and for this was indicted in the State of Pennsylvania, under an act of the legislature of said State against kidnapping, and was convicted, and the case was taken, by writ of error, to the supreme court of the United States, to test the constitutionality of the statute under which the indictment was found.

In the opinion of the court, it is said, in substance, that it was historically well known, that the object of the clause in the constitution of the United States, relating to persons owing service and labor in one State, escaping into other States, was to secure to the slaveholding States the complete *right and title of ownership in slaves, as property,* in every State of this Union into which they might escape from the State where they were held in servitude. The full recognition of this right and title, say the court, was indispensable to the security of this species of property in all the slaveholding States; and, indeed, was so vital to the preservation of their domestic interests and institutions, that it could not be doubted, that it constituted a fundamental article, without the adoption of which the Union could not have been formed.

Its true design was to guard against the doctrine and principles prevailing in the non-slaveholding States, by preventing them from intermeddling with, or obstructing, or abolishing the rights of the owners of slaves.

Again, say the court, the clause in the constitution of the United States, relating to fugitives from labor, manifestly contemplates the existence of a positive, unqualified right, on the part of the owner of a slave, which no State law or regulation can, in any wise, qualify, regulate, control or restrain.

And, again, the court say, we have not the slightest hesitation in holding, that *under and by virtue of the constitution,* the owner of a slave is clothed with the authority, in every State of the Union, to seize and recapture his slave, wherever it can be done without a breach of the peace or illegal violence.

This language, certainly, is clear and positive, and gives

no uncertain sound ; it unmistakably shows that slavery, under the constitution of the United States, was a legal institution, and that slaves lawfully belonged to the owners thereof, *and that they were property ;* and, consequently, could be lawfully bought and sold, and that such contracts were valid, and were supported by a legal consideration. Although the words, " slaves " or "slavery," are not mentioned in said acts, yet, the court do not hesitate to call things by their right name, and declare that they were passed to protect slavery, and to secure to the owners of slaves the full recognition of their right and title to that species of property.

5. In that case, the court, also, further say, the constitutionality of the act of congress, relating to fugitives from labor, has been affirmed by the adjudications of the State tribunals, and by the courts of the United States. If the question of the constitutionality of the law were one of doubtful instruction, such long acquiescence in it, such contemporaneous expositions of it, and such extensive recognitions, would, in the judgment of the court, entitle the question to be considered at rest. Congress, the executive and the judiciary, have, upon various occasions, acted upon this as a sound and reasonable doctrine. The court cite, in support of their decision, the cases of *Stewart v. Laird,* 1 Cranch, 299 ; *Martin v. Hunter,* 1 Wheaton, 304 ; *Cohens v. The Commonwealth of Virginia,* 6 Wheaton, 264.

Besides all this, the said act of 1850 makes it an offense in any one, who shall aid, abet or assist persons, owing labor or service, directly or indirectly, to escape, &c., and any person so offending is liable to a fine, not exceeding one thousand dollars, and, on indictment and conviction, to imprisonment, not exceeding six months.—1 vol. Brightley's Digest, &c., p. 297, § 9. This, certainly, is a conclusive admission on the part of Congress of the existence and lawfulness of slavery.

All this being true, what influence and effect had the proclamation of the president on the institution of slavery *in the rebel slaveholding States,* and upon the contracts of the citizens of said States, with each other, made in good faith, with reference to that sort of property, between the

McElvain v. Mudd, Adm'r.

date of said proclamation and the final suppression of the rebellion, a period of nearly two years and six months? I say, contracts *made between citizens of the rebel slave-holding States*, because it was unlawful for them and citizens of the United States to enter into any contract with each other, or to have any business, or commercial intercourse whatever, during the continuance of the war.— 1 Kent's Com. (mar.) p. 66.

At the time the said proclamation was dated, all the power of the United States could not enforce it, within the territory of the rebel States; nor was it, by the people of said States, admitted to have any legal efficiency whatever, but it was utterly denied that it imposed on them any obligation to obey it—and more, it was never, until the rebellion was suppressed, officially promulgated in said States, nor could it be.

It would seem, therefore, if there were no other reasons, *these people* should not be permitted to resist a performance of their contracts, *made with each other, in good faith, with a full and equal knowledge of all the facts relating to the subject-matter of their contracts, and each party assuming and taking upon himself all the risks attendant upon them.* Risking contracts are not unknown to the law, and, when honestly made, are enforced like other contracts.

We are persuaded, that the president, by whom this proclamation was issued, did not hold, or believe, that from its date it did or could, by its own vigor, so utterly abolish the institution of slavery *in the said rebel States, and all property in the slaves themselves,* in such manner as to render and make void all contracts made in relation to that kind of property. The language used by him in the preamble, and in the proclamation itself, clearly sustains this view of it.

The preamble recites, that, "Whereas, on the twenty-second day of September, in the year of our Lord, one thousand eight hundred and sixty-two, a proclamation was issued by the president of the United States, containing, among other things, the following, to-wit: That, on the first day of January, one thousand eight hundred and sixty-three, all persons held as slaves in any State, or designated

part of a State, the people whereof shall then be in rebel-lion against the United States, shall be then, thenceforward, and forever free; and the executive government of the United States, including the military and naval authority thereof, will recognize and maintain the freedom of such persons, and will do no act or acts to repress such persons, or any of them, in any efforts they may make for their *actual freedom*."

This is an admission that, notwithstanding said proclamation, the slaves, the subjects of it, were not then, by the mere force of the same, *actually free;* and it is, also, a declaration that, in the event they made any efforts to *obtain their freedom*, the United States would do no act or acts to repress such efforts. In the body of the proclamation it is declared, that it is made by virtue of the powers in the president vested, *as commander-in-chief of the army and navy of the United States*, in time of actual armed rebellion against the authority of the government of the United States, and as a fit and necessary *war measure*, for the suppressing of said rebellion. Consequently, if the rebellion should not be suppressed, the proclamation would not, and could not accomplish its purpose; and, therefore, until the rebellion was overcome, slavery would continue *in fact to exist*.

The proclamation was a mere war measure, so admitted by its own language, and, like any other war measure, worthless unless, and until, it could be carried into effect; therefore, it had no potential operation or force, *on the people of the rebel States*, until the rebellion was conquered. Then, and not till then, did or could the slaves become free by force of the said proclamation; and from that time, and not before, contracts for their sale or hire became invalid, for the want of any legal consideration to support them.

Being a mere war measure, the president, if it failed to accomplish the object intended and desired, by the same powers and authority by which he had issued it, by his powers and authority as commander-in-chief, might, at least, before it was executed and during the continuance of the war, *and while the same military necessity existed*, and before the slaves, the intended beneficiaries of it, had accepted of it

and become parties to it, and had acquired and entered upon the enjoyment of its benefits, in his wisdom and discretion, if he had believed it best, withdrawn the proclamation altogether, and have issued any other proclamation or adopted any other war measure that he might have thought would better accomplish the end desired—that is, the suppression of the rebellion, and the preservation of the Union and government of the United States.

Who can reasonably doubt, but that, at the conference at Fortress Monroe, the president might not *then* have withdrawn the said proclamation, if he had thought proper to do so, upon the rebel government and people stipulating to abandon their resistance to the government and authority of the Union, and renewing their allegiance to the constitution and government of the United States?

If this had been done, would not slavery have been continued, under the same guarantees and protection that it had before the rebellion began? For myself, I can not doubt but that such would have been the effect; and that slavery, now, if such a settlement had taken place, would have had a legal existence in all the then slaveholding States.

In the case of *Morgan, Adm'r, v. Nelson, Adm'r,* decided at the last June term of this court, it is held, that emancipation was a fact that would be judicially noticed by the courts, without proof; that it was a national act, and must be referred to some particular date; that it was founded upon the emancipation proclamation of the president of the United States, of the first day of January, 1863, and, consequently, that day, *by the doctrine of relation,* is held to be the day on which emancipation took place. This doctrine of relation, however, is never permitted to be used or applied, *in hinderance, but only in furtherance of justice.*

It must not, however, be forgotton or overlooked, in this connection, that the president's proclamation was issued when a formidable rebellion was prevailing in the States, in which the institution of slavery chiefly existed, and, therefore, it was not and could not then be executed; and,

whether it could be carried into effect, depended upon the suppression of that rebellion.

A mighty struggle was then going on to overcome that rebellion, which continued until the rebel authorities were overthrown and their armies captured, in the early part of the year 1865, more than two years after the date of that proclamation; then emancipation became an accomplished thing, and slavery ceased to have any existence, *either in law or in fact*, within the territory covered by said proclamation.

But during the period of that struggle, notwithstanding the proclamation, there continued, *in fact, an uncertain, indefinite and indeterminate value* in the institution of slavery, and property in the unfortunate subjects of it, the slaves themselves.

We see, therefore, that this proclamation, though positive in its language, depended upon a contingency—an uncertain event—the real end of which no one could then foresee, and no one could then know whether its purpose would ever be realized.

This uncertain and indeterminate value, or property, in slaves, where parties acted in good faith, formed a legal basis and consideration for valid contracts; in other words, this uncertain and contingent interest, or property in slaves, might be lawfully bought and sold.

An uncertain interest, a contingent remainder, a mere expectancy, even, is the legitimate subject of bargain and sale.—2 Story's Eq. §§ 1040–1055.

Such an interest is of no present value; that is, is not capable of present possession and enjoyment. Not so the interest that remained in slaves, notwithstanding the president's proclamation; that was an interest, in present possession and enjoyment, liable only to be defeated on the suppression of the rebellion. If that was never suppressed, then the institution of slavery, and property in slaves, would remain as though the proclamation had never been made.

This proclamation may have had, to a greater or less extent, an effect upon the value of this kind of property, but we know, historically, it continued nevertheless to be

freely bought and sold *by the people of the rebel States,* and was treated as property by the rebel government; a government that had military possession of the country, and a government the people were compelled to obey, whether they would or not. This kind of property was also administered by executors and administrators of deceased parties, and sold and distributed as other property belonging to estates was sold and distributed; and was also held to be property by the rebel courts, and was levied upon and sold, under their judicial process, in the same manner as other property. For these reasons, we see no better, no more rational way of considering and disposing of controversies growing out of contracts in relation to this sort of property, than to treat them as the parties themselves treated them when they were made, and to hold them, where good faith was observed, as valid contracts.

These views, I think, derive much support from the case of *Morgan, Adm'r, v. Nelson, Adm'r, supra.*

In that case, Morgan, as administrator, *before the date* of the emancipation proclamation, had received slaves belonging to his intestate's estate, and *after the said proclamation was issued,* either used the said slaves himself or hired them out, and had received their wages. One of the questions in the case was, whether he was to be charged for the use or hire of the said slaves, after the date of said proclamation. We held he was to be so charged. Judge PETERS, delivering the opinion of the court, (I quote from his head-notes,) says, speaking of emancipation, "It was effected by the nation, and not by the States; the only national act that decreed it was the proclamation of the president, of the 1st January, 1863; the struggle afterwards was merely an effort to prevent the proclamation from being carried into effect. The total failure of this struggle, *refers emancipation back to that date.* But, notwithstanding, the event of emancipation is fixed by the act of the nation, at the first day of January, 1863; yet, if an administrator used the slaves of his intestate for his own profit, after that date, he should be charged with such profits *up to the date* of the discharge of the slaves from his control by the *result of the war.*"

This is unquestionably right. It is common doctrine, that a trustee is not permitted to profit by his use of the trust property, but is bound to account for any profits he may make, by such use, to the beneficiaries.

But in that case, if the proclamation, by its own vigor, so utterly and absolutely abolished slavery from its date, that no interest or property remained in them whatever from that date, then it follows, *that from that date the slaves not only ceased to be trust property, but also ceased to be property at all;* consequently, it would seem, upon every principle of equity, that the profits derived from the use of the slaves did not belong to the estate, but should have gone to those who earned them. The plain inference from all this is, that, notwithstanding the proclamation, there continued an uncertain, contingent interest and property in slaves until the proclamation became effectual, by the suppression of the rebellion; and, therefore, the administrator was rightly required to account for the use of the slaves, from the date of the proclamation until they were discharged from his control, by the successful results of the war.

We remain satisfied with the decision in that case, and are persuaded, rightly understood, it was decided upon correct principles.

The principles settled by the supreme court of the United States, in the recent case of *Thorington v. Smith, et al.,* that went to that court, on error from the district court of the United States for the middle district of Alabama, it seems to me, inferentially, sustain the opinion in this case. It is there held, that a contract made during the rebellion, *between parties residing within the so-called Confederate States,* which, by the understanding of the parties, was to be satisfied in Confederate notes, could be enforced in the courts of the United States—that Confederate notes, although issued by an illegal hostile government, yet, such notes having, while the war lasted, been used as money in nearly all the business transactions of many millions of people, and having had a *certain contingent value,* therefore, they should be regarded as a currency, imposed on the commu-

nity by irresistible force, and should be treated in courts of law in the same light, as if they had been issued by a foreign government, temporarily occupying a part of the territory of the United States ; that contracts stipulating for payment in Confederate notes could not be regarded as made in aid of the rebellion, but are transactions, made in the ordinary cases of civil society, and though they may have, incidentally and remotely, promoted the ends of the unlawful government, are without blame, except when proved to have been entered into with the actual intent to further the rebellion.

These views, it seems to me, are persuasive of the correctness of the opinion in holding that slaves, notwithstanding the proclamation, nevertheless, until the rebellion was suppressed, and the said proclamation became effectual to control the people of the rebel States, continued during the period between the date of the proclamation, and the end of the war, to have an *uncertain and contingent value in said rebel States*, and that contracts made *between citizens of said States*, in reference to that species of property, are sustained by a lawful and sufficient consideration.

A majority of the court, therefore, hold that the note upon which the action is founded, when made, was a valid contract, and sustained by a legal consideration, and that the plaintiff in the court below was entitled to recover upon it, unless this right to recover was defeated by the third section of the ordinance of the convention of 1867, above referred to.

3. We now proceed to consider the question raised in this case, upon said ordinance.   The third section thereof, is in the words and figures following, to-wit : " And be it further ordained, and it is hereby declared, that there is a failure of consideration, and it shall be so held by the courts of the State, upon all deeds or bills of sale given for slaves, with covenants of warranty for title or soundness, or both, and upon all bills, bonds, notes, or other evidences of debt, given for or in consideration of slaves, which are now outstanding and unpaid, *and no action shall be maintained thereon,* and that all judgments and decrees rendered in any of the courts of this State, since the 11th

day of January, 1861, upon any deed or bill of sale, or upon any bond, bill, note or other evidence of debt, based upon the sale or purchase of slaves, are hereby declared set aside, and the plea of failure of consideration shall be held a good defense in all said suits; *Provided*, That settlements and compromises of such transactions, made by the parties thereto, shall be respected."

It is certain, if this section can be upheld, then the note upon which the action is brought, and all like contracts therein named, contracts "based upon the sale and purchase of slaves," are worthless. We have already declared the first section of this ordinance unconstitutional, because it impaired the obligation of contracts.—*Roach, Adm'r, v. Gunter*, at the last June term.

We think this third section must share the same fate. The constitution of the United States declares that, " no State shall pass any law impairing the obligation of contracts "—Part 1, section 10, article 1. This ordinance can claim no exemption from the force and effect of this constitutional provision, because it is the act of a convention of the people of the State, and not a law passed in the ordinary course of legislation by the general assembly thereof; for the reason it is the State itself, in its corporate character, that is prohibited from passing such a law. If this third section formed a part of the constitution, it would not save it from the operation of this constitutional prohibition. Part 2, article 6, of the constitution of the United States declares that, " this constitution and the laws of the United States, which shall be made in pursuance thereof, &c., shall be the supreme law of the land, and the judges in every State shall be bound thereby; any thing in the constitution or laws of any State, to the contrary notwithstanding." We have no hesitation in declaring that this third section of said ordinance impairs the obligation of contracts, and is, therefore, unconstitutional and void.

It does more in legal effect, it utterly abrogates, nullifies and makes void all the kind of contracts named in it.

It is terribly sweeping in its character, and embraces contracts and notes for the sale of slaves, even before the date of the ordinance of secession, as well as those made

after the date of the proclamation of the president. We, therefore, hold that said third section is void, both as to contracts made before the date of said proclamation, and those made in good faith, between the date thereof, and the suppression of the rebellion. We refer to the following, as a few of the many cases on this subject, to be found in the reports of the States, and of the courts of the United States.—*Green v. Biddle*, 8 Wheaton, 1; *Gilpeke v. Dubyne*, 1 Wallace, 175; *Havemeyer v. Iowa County*, 3 Wallace, 294; *Thompson v. Lee County*, 3 Wallace, 327; *Johnson v. Bond*, Hempstead's Rep. 533; *Webster v. Cooper*, 14 Howard, 488; *Bronson v. Kenzie*, 1 Howard, 316; *Lewis v. Broadwell*, 3 McLean's Rep. 568; *Arrowsmith v. Burlengim*, 4 McLean, 490; *McCracken v. Haywood*, 2 Howard, 600; *Howard v. Bugbee*, 24 Howard, 461; *Curren v. Arkansas*, 15 Howard, 304; *Tennessee & Coosa R. R. Co. v. Moore*, 36 Ala. 373.

No question is made in this case as to the sum the plaintiff was entitled to recover. There is no evidence in the bill of exceptions that shows, by the understanding of the parties, the note was to be paid in Confederate money, or that the slaves bought were not, at the date of the note, in the contemplation of the parties, worth the sum agreed to be paid in the legal currency of the United States.

The judgment of the court below, is, therefore, affirmed, with five per cent. damages—see Ordinance, No. 35, of 1867; Pamphlet Acts, 1868, p. 182—and the costs of this court and of the court below.

B. F. SAFFOLD, J.—I concur in the opinion of the chief justice. His conclusion follows inevitably his argument. Slavery in Alabama ceased, in fact, in the spring of 1865, through the military force of the United States government. War is yet a legislative power, and wages of battle is still a mode of trial. If it should ever become important to determine the precise time when the abolition of slavery was effected by law in this State, I am satisfied it will be referred to the date of the adoption of the 13th amendment to the federal constitution.

PETERS, J. (dissenting.)—1. I do not feel able to agree

with the majority of the court in the judgment just announced, nor in the reasoning upon which it is based.

2. In the view I take of this case, the material facts are these : William S. Mudd, as the administrator of the estate of James A. Mudd, deceased, instituted suit in the circuit court of Jefferson county, in this State, against Wallace S. McElvain and others, on the 25th day of February, 1867. This suit was founded upon a promissory note for the payment to said William S. Mudd, as administrator aforesaid, of the sum of five thousand, three hundred dollars, three years after the date of said note, which bore date the first day of February, 1864, with interest thereon from the date, at eight per cent. per annum. This note was made in this State, and it was given for the purchase-money of *three* persons sold as negro slaves in this State, in said year 1864. The cause was removed, by agreement of the parties, from the county of Jefferson to the county of Shelby, in this State, and there tried in March, 1868. The judgment was for $7.054, besides costs of suit.

3. On the trial, the defense relied on was the invalidity of the note, as a contract for the sale of slaves made since the first day of January, 1863. This defense renders it necessary to consider the effect of Ordinance No. 38 of the convention of 1867, and the effect of the emancipation of the slaves in this State upon such a contract. The ordinance referred to is entitled " An ordinance concerning the value of contracts, where the consideration was Confederate bonds or currency, and for the purchase of slaves," passed December 6th, 1867.—Pamph. Acts, 1868, pp. 185, 186. In treating of this ordinance, I will refer, incidentally, also to the validity of contracts for " Confederate money," though that question is not involved in this case, as it is now presented to this court.

4. After the passage of the ordinance of secession, on the 11th day of January, 1861, the new political organization which was formed in the State of Alabama, was unlawful and revolutionary towards the government of the United States. It had no constitutional connection with this latter government. It did not form the government of a State of the Union, though it was within the boundaries

of the United States and upon the territory of the State of Alabama. Such a political organization has no rights under the constitution of the United States.—Tiffany on Gov. pp. 314, 315, 316, 317 ; *Cherokee Nation v. Georgia,* 5 Pet. 1; *Hepburn et al. v. Ellzy,* 2 Cr. 452 ; *Owings v. Speed,* 5 Wheaton 420 ; *Herman v. Phelan,* 14 Howard, 79. This government then being illegal, every department of it was also illegal. The whole being bad, the parts were bad also. *Quad majori non valet, nec valet in minori.—*Coke, (Litt.) 262. It therefore follows, that its legislative acts, its judicial proceedings, and its executive proceedings, were all invalid, unless confirmed by the rightful authority— 5 How. 343 ; 7 How. 1 ; 7 Wall, 700.

5. If the reverse of this were true, then secession and the proceedings under it were rightful and legal. But this has been denied by every branch of the Federal government, and by this State, since its restoration, in every department of its government.—Ordinance No. 13 ; Revised Code, p. 55 ; Ordinance No. 16 ; Pamp. Acts, 1868, p. 167 ; Proclamation of Gov. Patton, Feb. 13, 1866 ; *Hall v. Hall,* at June term, 1869 ; *Chisholm v. Coleman,* at January term, 1869.

6. This unlawful and revolutionary government was overturned in the year 1865, at least as early as May of that year. During the interregnum, from the 11th day of January, 1861, until the insurgent organization was destroyed, there was no legal government in this State ; and whilst this period lasted, the customary seats of administration being in possession of the rebel authorities, no steps could be taken by the rightful government, to prevent an illegal use of the legislative, judicial and executive functions of the government administered in this estate, until this illegal government should be suppressed. This was, then, a period of time, during which the powers of the State, as a member of the Union, were suspended, though they were not destroyed. Thus, the legislative power of the rightful government was deprived of an *opportunity* to discharge its legitimate functions. Under such circumstances, many things might have been done, under pretense of authority, which might not have been permitted under the rightful

government; or which the rightful government might have refused to allow, had the power to act remained within its control. And, undoubtedly, what the rightful government could have forbidden, it may now, on its restoration, refuse to sanction. There is no doubt, that the rightful government could have emancipated the slaves, and could have refused to permit the making of contracts for the sale of slaves within its own borders.—*Jones v. Slaughter*, 15 Pet. 449; *Roman v. Reynolds*, 5 How. 134; Cobb on Slavery, (Historical Sketch,) p. clxxi, (171,) *et seq.*; *McCutchen v. Marshall*, 8 Pet. 220; *Butler v. Hopper*, 1 W. C. C. 499; 2 Kent, 252, and notes. And upon a like principle, the rightful government might have refused to permit contracts for the circulation of the bonds and treasury-notes of the so-called Confederate States; or it might have refused to allow a hostile government to set up its courts within its borders; or to give validity to the judgments and sentences of such courts. These are powers that belong to all the States. They are rights which are inherent in that sovereignty, which is an essential element of State authority.—*Craig v. Missouri*, 4 Pet. 410. 462, 463, 464; 3 Dal. 6.

7. Then, most clearly what the State may have refused, it may deny to an usurper, who has illegally displaced its authority. The rightful State is not to be deprived of the power to regulate its own policy and its own domestic affairs, by an illegal authority. If it can not act by way of prevention, in the first instance, it may act by way of cure, in the end. The rightful authority is not to be paralized and defeated by the assumed authority of a mere attempt at revolution. At least, the courts in this country, can not, without the aid of legislation, set up and validify the proceedings of a revolutionary government.—5 Howard, 343; 7 How. 1.

8. It is to be presumed, that the rightful authority of the State would have acted within its rightful sphere. With it, the policy of the nation, *for its preservation*, would have been the policy of the State. This was the case of all the loyal States, and of West Virginia and Missouri, which were slaveholding States, that remained loyal to the Nation. This is what all the States have done that have returned

McElvain v. Mudd, Adm'r.

in good faith to their obedience to the national constitution. Then contracts for the circulation of Confederate bonds and treasury-notes would not have been permitted or sanctioned by the rightful government; because they were opposed to the public policy of the nation, and were void.—*Kennett v. Chambers*, 4 How. 38; Benj. on Sales, 384. And slavery would have been abandoned when the policy of the national government required it, *for its own peace and safety*. For in a national sense as well as in an individual sense, *salus populi suprema lex*. Therefore, the power of the rightful State to judge of this, and to act as it may think best, is not to be controlled by the interposition of an illegal, insurgent power. Else the loyal sovereign will of the State may be illegally defeated.—1 Story on Const. § 208; *Chisholm's Ex'r v. Georgia*, 2 Dal. 419, 471.

9. What then the State could have forbidden, but was prevented from doing, in consequence of the illegal suspension of its authority by the insurrection, it may prevent from being consummated, as soon as its authority is restored. Otherwise, the irregular and insurgent government must become paramount to that which is legal and regular, and the legal sovereign authority may be set at naught. This would be absurd, and invite to revolution. No government can control its own affairs under such a system, if the rightful authority is thus subject to be displaced and defeated by insurrection or rebellion. In order to prevent this defeat of the rightful legislative will, the rightful government must retain within itself the power, upon its restoration, to deny validity to all the acts of the rebel organization, by whatever name it may be called. And this power must not only extend over the period covered by the supremacy of the rebellion, but it must also apply to the whole period from the suspension of the functions of the rightful government until its permanent restoration After the full and perfect restoration of the government, and not till then, is the State subjected to the control of the rightful authority, which represents the *loyal sovereign will*, and which is the *supreme* and *governing* power of the State, under the limitations of the constitution of the Union. Reconstruction Acts of Congress; Preamble of the Act of

March 2, 1867; Act of July 19, 1867, § 1; President John-son's Proclamation, June 21, 1865, clause numbered *"first;"* Gov. Parson's Proclamation, July 20, 1865, clause num-bered "4;" Revised Code, pp. 73, 76.

10. Tried by these principles, it seems to me beyond all question, that the ordinances numbered 38 and 39 of the convention of 1867, so far as they relate to the judgments therein mentioned, are free from constitutional objection, and they are to this extent binding on the courts until re-pealed. The judgments of the rebel courts condemned by the ordinances above referred to are void, because they are the acts of a void judicial authority.—Lofft. 453. This is what the convention declared, and this it had the authority to do. If not, then these acts of an illegal and void power would be beyond the rightful legislative control. They would defy the control of the rightful sovereign will for their correction, should it be discovered that they were wrong. Such an example of the ratification and approval of the authority of a mere insurrection is not to be found anywhere supported by any declaration of the congress, or the judgments of the highest courts of the nation.

11. The legislative authority of the State is the sole and supreme law-making power, for the control of its domestic affairs; and where this authority is not limited by consti-tutional restrictions, it is practically absolute. The *whole* law-making power is vested in the legislature, and whatever laws are needful to be enacted must come from this au-thority.—Cooley on Const. Limit. pp. 167, 168, 169, and notes; Const. Ala. art. 4, § 1. The constitution was not made to protect the judgments of rebel courts, or the judg-ments of illegal governments. And where they are not so protected, they are at the mercy of the legislative power of the rightful authority.

12. But besides this, the second section of ordinance No. 38 is in these words: " *Be it further enacted,* That all bills, bonds, notes, or evidences of debt, outstanding and unpaid, given for or in consideration of bonds or treasury-notes of the so-called Confederate States, or notes or bonds of this State (to be) paid and redeemable in bonds or notes of the Confederate States, are hereby declared null and

McElvain v. Mudd, Adm'r.

void, and no action shall be maintained thereon in the courts of this State."—Pamph. Acts, 1868, p. 186. It is known to the court, as a part of the history of the late war, that these treasury-notes and bonds of the said Confederate States were issued and circulated in aid and support of the rebellion, and that they furnished the means by which the insurgent soldiery were chiefly, if not wholly paid, and supplied them with the means of subsistence. It is also known, that, varying in amount, denomination, date, number and signature, the said treasury-notes were in the following words: "Two years after the ratification of a treaty of peace between the Confederate States and the United States of America, the Confederate States of America will pay twenty dollars to the holder, on demand. A. No. 36,-349. Richmond, February 17, 1864. S. Selot, *for the register.* S. M. Cants, *for the treasurer.*" It is doubtful whether these notes will ever become due, and consequently they are utterly worthless.

13. It is also known, that these notes and bonds came into being as instruments of the rebellion ; and were issued mainly for the purpose of paying the expenses of the insurgent government, and not for the purposes of legitimate commerce. Such a purpose was in contravention of the policy of the government of the United States. Their issuance and circulation was therefore illegal. All contracts to aid an illegal purpose are tainted with its illegality—1 Par. Contr. p. 456. They were therefore void. This the State, by law, could declare, without any violation of the constitution of the United States.—*Davidson v. Lanier,* 4 Wall, 447 ; *Brown v. Tarkinton,* 3 Wall, 377 ; *Nordlington v. Vaiden,* 2 Amer. Law Rev. 188 ; *Bank of Tenn. v. Union Bank,* 2 Amer. L. R. 346 ; *Ex parte Miller,* 16 Amer. L. R. 371 ; *Tufts v. Tufts,* 3 Woodb. & Minot, 457.

14. The ordinance in reference to the sale of slaves, is one of more difficulty than that in relation to judgments ; because it involves the consideration of the constitutional provision for the protection of contracts.

15. It cannot now be denied that slavery is abolished in this State, and that the slaves are all made free. Nor will

it be denied that emancipation has been effected by the act of the nation. This is the repeated admission of this court; and under its present organization, it is not to be presumed that the correctness of this admission will be questioned. There may be some difference of opinion in regard to the manner in which emancipation has been brought about, and the precise date at which it took effect, but none that it has been accomplished.—*Miller v. The State,* 40 Ala. 54; *Nelson, Adm'r, v. Morgan, Adm'r,* June term, 1869.

16. The first great national act that assailed the institution of slavery, as a whole, in this State, was the proclamation of President Lincoln, issued on the first day of January, 1863. This proclaimed the absolute and unconditional emancipation of the slaves in certain portions of the United States, of which the State of Alabama was a part. The government was then in the midst of a fierce struggle for its preservation, and this great measure was deemed *necessary* for its success in that struggle. After that date, it became the *policy* of the nation to enforce this proclamation; and it was persisted in until it was finally successful. It may be said, that such a measure was founded in revolution and force; but this does not destroy its rightfulness nor its effect. The nation achieved, in the end, what it had proclaimed. In such cases, it is a rule almost without exception, that the effect of such measures must be referred to the beginning, or to the first proclamation of the purpose intended to be accomplished. The American colonies proclaimed themselves free and independent States, on the 4th day of July, 1776. They did not, however, achieve their independence until the end of a long and bloody war, which lasted for above seven years, until September 3d, 1783— Dec. of Ind., Revised Code, pp. 1, 3; Wilson's Amer. Hist. 358, 408. Yet, in law, the effect of the proclamation of independence is referred to the fourth day of July, 1776.— *McIlvaine v. Coxe,* 4 Cranch, 209. The same is the case with the construction of treaties. Though they are not completed until ratified by the consent of the Senate, and would be invalid without that ratification, (Const. of U. S. art. 2, § 2, cl. 2,) yet in their operation they are held, in

law, to *take effect* from their date.—*United States v. Regnes,* 9 How. 127 ; *Davis v. Parish of Concordia,* 9 Howard, 280 ; *Montault v. U. States,* 12 How. 47 ; *U. States v. Daulerive,* 10 How. 609.

17. Referring to emancipation, Chief-Justice Chase, delivering the opinion of the court, in the case of *Texas v. White,* says : " Slaves in the insurgent States, with certain local exceptions, had been declared free by the proclamation of emancipation ; and whatever questions might be made as to the effect of that act, under the constitution, it was clear from the beginning that its practical operation, in connection with legislative acts of like tendency, must be complete enfranchisement. Wherever the national forces obtained control, the slaves became freemen. Support to the acts of congress and the proclamation concerning slaves, was made a condition of amnesty by President Lincoln, in December, 1863, and by President Johnson, in May, 1865.—13 Stat. at large, 737, 758. And emancipation was *confirmed,* rather than ordained, in the insurgent States by the amendment of the constitution prohibiting slavery throughout the Union, which was proposed by congress in February, 1865, and ratified before the close of the following autumn, by the requisite three-fourths of the States." 13 Stat. at large, 774, 775 ; 7 Wall. 728.

18. But besides this *confirmation* of the proclamation of emancipation above referred to, it is a well known historical fact, that before the issuance of that instrument many of the slaves of this State had become entitled to freedom under the operation of the fourth section of the act of congress of August 1st, 1861.

19. The proclamation was but the culmination of the policy of the several acts of congress which had preceded it, and which had the same tendency and purpose. By the act of August 1, 1861, all slaves who were used in any military or naval service against the government of the United States were made free.—12 Stat. at large, 319. So were the slaves of all persons engaged in the rebellion. And fugitives from labor were not to be returned.—Act of congress, July 17, 1862, §§ 9, 10 ; 12 Statutes at large, 591. President Lincoln's amnesty proclamation of December 8,

1863, required the parties seeking to avail themselves of its benefits to swear, "to abide by and faithfully support" "all the acts of congress passed during the existing rebellion with reference to slaves, so long and so far as not repealed, or held void by congress or by decision of the supreme court;" and "*all proclamations* of the president made during the existing rebellion having reference to slaves, so long and so far as not modified or declared void by decision of the supreme court."—App. to Acts of Congress of 1863-4, pp. 6, 7, 8. The amnesty proclamation of President Johnson, which bears date May 29th, 1865, was to a similar effect, and contains a like condition. The latter proclamation required all persons seeking amnesty and pardon under it, to swear as before, to "abide by and faithfully support all *laws* and *proclamations* which have been made during the existing rebellion, with reference to the *emancipation of slaves.*" How could this be done, unless the proclamation was accepted as of its date, and the acts of congress above cited in the like manner? Most certainly, the oath of amnesty required this.

20. It is known to the court as an historical fact, that a very large majority of the white voters of the State have taken the benefit of the amnesty thus offered, and have complied with its terms. This was the most solemn confirmation and ratification of the proclamation of the first day of January, 1863; and this could only be done in the language of the proclamation itself. Thus, the emancipation of the slaves in this State was fixed as of the date of that important State paper, and we are in a certain measure estopped to deny it. This document declares, that "all persons held as slaves," in the State of Alabama, "are and henceforth shall be free."—Public Laws of the U. States, 1862-3, App. p. 3. This important system of measures from the year 1861 to the year 1865, shows that it was the purpose and policy of the government of the United States to abolish slavery in the insurgent States, and that this purpose was fixed to take effect on the first day of January, 1863, and that it was so *accepted* and *confirmed*, as of that date, by all persons who took the benefit of the amnesty

above referred to, which constituted a large majority of the white male people of the State.

20. Then, all sales of slaves which occurred after that date were illegal, and this the ordinance properly declares. The sales were, moreover, against the public policy of the nation, and for that reason also they were illegal and void. *Tool Co. v. Norris*, 2 Wall. 45 ; *Kennett v. Chambers*, 14 How. 38 ; *Nelson v. Morgan*, January term, 1869.

21. The precise date at which emancipation took effect in this State being thus settled, I pass on to consider the influence of emancipation upon all agreements for the sale of slaves in this State, irrespective of the time at which they may have been contracted.

22. Slaves were held in their unhappy condition by a regulation founded in force on the one hand, and weakness on the other. There was no positive statute of the State which *ordained* slavery. It was permitted and protected, but it was not *created* by legislative enactment. It was never a creature of the common law. It existed only as a local institution. The great founders of the government shunned the use of the word *slave* in the constitution, and the eloquent proclamation of independence openly defied the truth of the basis on which slavery was founded. Slavery violated a great natural law; that is, that man is of necessity, for his own support, entitled to the proceeds of his own labor. It is said, that to seize the property of another is intrinsically immoral and unjust; and to invade what is rightfully in his occupation is esteemed a crime against a primary law of nature. If, then, it is a crime to seize one's property, it can not be a virtue to deprive him of his liberty, which, in many instances, is his only means of acquiring that property. Then, upon all principles of right *slavery was an injustice.—The Antelope*, 10 Wheat. 120, 121 ; Ruthf. Insts. of Nat. Law, 240 ; Curtis, J., in *Scott v. Sanford*, 19 How. 624 ; Dec. of Ind. par. 2, Rev. Code, 1 ; Const. of Ala. art. 1, § 2 ; 1 Wooddes' Lects. 15 ; *Forbes v. Cochrane*, 2 B. & Cres. 448 ; *Somersett's Case*, Loft's Rep. 1 ; 11 Harg. State Trials, 339 ; 20 Howell, State Trials, 79 ;

6

*Jones v. Van Zandt,* 2 McL. 596; Dig. 49, 15, 19, 2; Grot. de Jure Bel. L. 3, C p. 51.

23. Then, when the permission and protection on which this fabric of force and injustice had been erected, was withdrawn, it necessarily fell. For when the law fails, the right fails.—3 Dal. 378. By the great national edict which withdrew the force on which the institution stood, the slave was not declared to be emancipated, but slavery was forever forbidden. The power that upheld it was withdrawn. The language of the fundamental law is this : " Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction."—Const. U. S. article 13, § 1, Revised Code, page 22. This is not the language of repeal ; it does not acknowledge that slavery ever rested upon statute law, or upon right ; but it denies its authority longer to exist. If any just legal power in the master, over the person claimed by him as his slave, ever existed, it takes this power away. It does not destroy the person held as a slave, but it destroys the authority of the master to hold him in subjection as such slave. It destroys the law of slavery altogether, and leaves the effects of this destruction to be determined by the States themselves.

24. In all sales, the intention and purpose of the parties is of the essence of the contract. In this, both parties must concur. There is no contract unless the parties thereto assent, and they must assent to the same thing and in the same sense. If one sells a slave for life, he asserts that he can pass such title, and he must be in a condition to make his assertion true ; else the party who buys a slave for life does not get what it was his purpose to purchase. And the condition of such a sale is, that the vendor must make his title good, or the sale is violated on his part, and may be rescinded if the purchase-money is not paid, and the power to make title wholly fails.—2 Parsons on Contracts, 278, 279, and notes. In the sale of all personal chattels, the law implies an affirmation by the vendor, that the chattel is his own, and that he can and will make good such title as he sells, and such as the buyer intends to purchase.—

*Cozzins v. Whitaker,* 3 S. & P. 322; Benj on Sales, 474. And even without a warranty, it has been said to be the undoubted right of the buyer to recover back the purchase-money, on the ordinary purchase of a chattel, where he fails to get what he paid for; or if he has not paid the purchase-money, before the failuré of the power to make title, he may refuse to do so, after the power to make title has failed or has become unlawful. The law will not make a party take and pay for what he did not intend or consent to buy.—Benj. on Sales, 308. The warranty is a part of the contract of sale; if this fails, then the sale fails with it. Here the power to make the warranty good, has wholly failed. It has become illegal and impossible, and the party bound by it is therefore released.—*Glover v. Taylor,* 41 Ala. 124; *Perry v. Hewlett,* 5 Por. 318; Ruthf. Insts. p. 144, § 39. *Presb. Church v. City of New York,* 5 Cow. 538; 2 Parsons on Contracts, pp. 674, 675.

25. Again, it is said, that no right can be founded on an injury or an injustice, or in violation of a law of God. This is a principle of common law, and though it may not heretofore have been applied in cases like the present, yet, there can be no doubt, if these contracts were based upon the sale of our more favored fellow-citizens, whose good fortune had colored their faces white instead of black, we would still treat it with marked respect, and very few would be found to stand up for the enforcement of the sales of the sons and daughters of the commonwealth, how long so ever they might have suffered in slavery. Yet, this is the question now under discussion; and, possibly, an old, familiar and carefully cherished, prejudice may interpose to prevent us from feeling its enormity.—Ruthf. Inst. p. 17; Const. Ala. Art. 1, § 2; Broom's Max. pp. 17, 18, (marg.)

26. But however this may be, it is certain that every contract, to have validity, must be founded upon a law. It is said that this law enters into it, and gives it its obligation.—*Von Hoffman v. City of Quincy,* 4 Wallace, 535, 550. And if this law, on which the contract stands, is repealed or abrogated, without exception in favor of such contract, the contract must fail, because it has no law to support it. If the law is taken away the obligation of the contract is

gone. It is true that the State cannot assail a contract in this manner, by the repeal of the law on which it stands.— 4 Wallace, 535, *supra;* *Green v. Biddle,* 8 Wheaton, 92 ; *Bronson v. Kinzie,* 1 Howard, 319 ; *Ogden v. Saunders,* 12 Wheaton, 231 ; *Sturgis v. Crowningshield,* 4 Wheaton, 122 ; *Fletcher v. Peck,* 6 Cranch, 87 ; *New Jersey v. Wilson,* 7 Cranch, 164 ; *Terret v. Taylor,* 9 Cranch, 43 ; *Pl. Bk. vs. Sharp et al.,* 6 How. 327 ; *Beers v. Haighton,* 9 Pet. 359 ; *Mason v. Haile,* 12 Whea. 373. But in this case it is not the State that has abrogated the law of these contracts, but the national government or the people, upon whom there is no such limit or restriction.—*Evans v. Eaton,* Pet. C. C. 322.

27. Whether the government of the United States had the right to abolish the law of slavery in this State, can not now be made a question. It has been done, and the present State government of this State is organized upon the ad-- mission that it has been rightfully done. There is, then, now, no law in force to support these contracts for the sale of slaves in this State. The right to enforce, then, must rest upon law, or it fails. To say that they were once legal, and therefore remain legal, is not enough. It must appear that the law upon which they originally rested, still re- mains a law, or that in its abrogation they were excepted, or that there is some constitutional provision which pro- tects them. But nothing of this kind can be shown. *Sub- lato fundamento cadit opus.*—Jenk. Cent. Cases, 160 ; *Hol- lingsworth v. Virginia,* 3 Dal. 378. Upon the extinction of the law of slavery these contracts became illegal, and a contract which is illegal, is void, in law. This is what the ordinance above referred to declares ; and it violates no clause of the constitution of the United States or of this State.

28. Again—that which operates upon the consideration of a contract effects the contract itself. If the considera- tion fails, the contract fails. Here the character of the person sold was of the very essence of the consideration of the contract. The sale was that of a slave for life. This was the main and sole condition of the sale. It was the cause and purpose of the sale, and it constituted the

entire consideration of the promise to pay the purchase-money by the vendee. The purchaser did not contract for the services of the person sold, but for the person himself, as for a horse or a mule—as for a thing constituting an article of property subject to perpetual continuance in the condition of a slave for life, so long as life lasted. This was the whole intention, expectation, and purpose of the sale; and this it was the purpose of the warranty to defend and make good. If this purpose is defeated, then the sale is defeated, and it does not effect what both parties intended it should accomplish. That the purpose and the expectation of the parties to the sale have been defeated, it would now be idle and reckless to deny. The purpose of the sale has been rendered illegal and impossible by the law—by the will of the supreme power in this State. It has wholly broken down the contract of sale on one side by rendering it illegal to fulfill it. Such legislation abrogates the sale.—5 Cow. 538, *supra;* 2 Pars. Contr. 674, 5th ed.

29. It must be admitted that the *status* of the person sold, who created the whole consideration of the contract of the sale, has been changed by law, or which is the same thing, by the national will—which is law in this case. This change has defeated the purpose of the contract. It has rendered that purpose unlawful. This is similar to the case, where a party agreed to import goods within a certain time, and before the time arrived, the government interposed by embargo, and made the performance of the agreement unlawful. This would put an end to the contract. It would repeal it. This case is almost identical in principle with such a case as that. Here the vendor can not do what he promised to do—that is, make the person sold a slave for life.—Pars. Contrs. 5th ed. p. 674; *Presb. Church v. City of New York,* 5 Cowen, 538; *Brewster v. Kitchen,* 1 Ld. Raym. 317, 321 ; 1 Salk. 189.

Emancipation was an assault, by the law, upon the consideration of the contract of sale which destroyed it. This causes the contract to fail, and overturns the mutuality of the agreements which constituted the sale. It suffers the plaintiff to be released on his part, and then to turn round

on the defendant and compel him to perform his part of the agreement of sale ! There is, I apprehend, no admitted principle of law that sustains this result. It is radically wrong and unjust. And whatever we may think to the contrary now, the time will come, and is even now at our doors, when this outrage upon principle will be denounced and driven from our courts, where justice, in this absence of a statute, should be the measure of a law. *Equum et bonum est Lex Legum.*—Hob. 224 ; Const. Ala. art. 1, § 15.

30. A contract consists of a promise, a consideration, and a condition—(Daniel Webster)—and in all contracts of mutual benefit, whatever obligation one party is under to give or to do, it is undertaken upon condition of his receiving the equivalent agreed upon. If, therefore, he fails to receive such equivalent by the other's non-performance or inability to perform, the condition fails, upon which he consented to be obliged, and he ceases to be longer under obligation.—Ruthf. Insts. p. 141, § 36. Whilst the whole of the sale remains as the parties understood it, and intended it, with all the remedies on both sides unimpaired, as they were at the time the sale was entered into, then it would be just to enforce it on both sides ; but when the law intervenes and prevents this, the law breaks down this mutuality of obligation, and discharges the party on the one side. It also releases the party on the other. In a word, it puts an end to the sale as the parties made it, understood it, and assented to it. This destroys the sale. And so the ordinance of the convention, under discussion, has declared. The new facts which effect these contracts since emancipation, required a new rule to measure their force under these new facts. This could be supplied only by law, through the legislative power of the State. In this, the State could act without any restraint upon its sovereign authority, and may do what it pleases. The limitations upon the States are not to be extended by construction ; and a law will not be held to be unconstitutional, unless it is clearly and plainly so.—*Falconer v. Campbell,* 2 McL. 195 ; *Hubbard v. N. R. R. Co.,* C. C. 84 ; *Booth v. Town of Woodberry,* 5 Amer. L. Reg. N. S. 202 ; *Fletcher v. Peck,* 6 Cra. 87, 128. Here this contract was

impaired by the action of the national government, and the State has simply declared what this impairment shall have in its own courts.— *Wainwright v. Bridges*, 19 La. An. 234; 3 Am. Law Rev. 333, 334; *Burbridge v. Harrison*, 20 La. An. 357. In making these sales, the parties had no reason to suppose that they would be interfered with by law, as they have been. They had no idea that they would thus be defeated. Here there was that which amounted to a false affirmation innocently made, and the purchaser was certainly misled by it. This justifies the recission, and the property, if valueless, need not be returned.— *Smith v. Richards*, 13 Pet. 26; *Christy v. Cummins*, 3 McL. 386; *Gunnel v. Dade*, 1 Cr. C. C. 427.

31. Here the doctrine of *vis major* does not apply, because the property sold was not destroyed by act of God or by the public enemy, but by act of law. The national authority has said that the vendor of the slave shall not make good the title that he sold; and then the State intervenes and declares that this interference puts an end to the contract of sale, and that the price shall not be recovered in the State courts. This is just what the parties themselves would have done, had they been in a condition to anticipate the present results.

32. It can not, with any just reason, be expected that there will be found decided cases upon all the questions arising out of the late war, and the legislation to which its complications have given rise. That which has been done without law, and in spite of law, or which has been assailed by law, must be settled by the courts according to " right and justice," if there is no statute to direct.—Const. Ala. article 1, § 15. But if there is a statute to direct, it must be followed, unless it is void for want of constitutional conformity. Undoubtedly according to "right and justice" the vendee would not be bound by a contract of sale of personal chattels, which the vendor had no power of carrying into effect, as the parties understood it at the time it was made.—Smith on Contracts. If a party makes a sale of personal property, and it is destroyed at the date of the sale, this defeats the agreement of sale.— 1 Par. on Con. 521, 522. The like would be the case if it

was destroyed before delivery; and it is presumed, if the law forbid the delivery, it would have the same effect.— *Nerot v. Wallace*, 3 T. R. 17; *Bates v. Court*, 2 B. & C. 474. Now this is so, because there is a law making this the rule. Here, although there was an agreement of sale, yet before the price was paid, the supreme law interposes, and takes from the vendor the power of conferring the benefit up to the extent that the benefit proposed to go, both in fact and in law, so as to make the title good. It does not simply make the vendor's title bad, but it declares that he shall not be bound to make it good. It discharges him from his warranty.—5 Cow. 538, *supra*. If the vendor accepts this discharge, then he makes the act of the government his own. He takes the benefit, and should suffer the loss. He is discharged from his warranty, and should give up the price. Under this new condition of the facts, the State legislative authority intervenes and makes a new rule, for the guidance of its courts. That is, it declares, that these emasculated sales shall not be the foundation of an action in its courts. This is certainly not the power denied by the federal restriction. The ordinance being within the limit of State legislative power, the court is bound to enforce it. This tribunal is not to judge of its fitness or its unfitness; its policy or impolicy; its wisdom or its folly; its justice or its injustice. If it is a law, it must have the effect and force of law. It must be obeyed.

33. If the proclamation of emancipation had any force at all, it must have had the same effect everywhere—all over the nation—except in those places where it was otherwise limited, because it was a national act, and it was executed by the national authority. It was a proclamation of the national policy, and as such it was confirmed by the acceptance of amnesty by the people of this State, under President Johnson's proclamation, dated the 29th day of May, 1865; and this confirmation must be referred to the thing confirmed.—1 Bouv. Law Dict. (12th ed.) *Vox Confirmation*, page 319. So far, then, as the case of *Leslie v Langham* conflicts with this view of the law, it ought to be. over ruled.—40 Ala. 524; *Nelson, Adm'r, v. Morgan, Adm'r*, June term, 1869.

34. The seeming injustice of an affirmance of the judgment below, appears from the fact, that the appellant will be made to pay quite eight thousand dollars, in legal funds, to the appellee, for property in persons, now citizens of the State, who had been declared enfranchised by the nation, and whose emancipation the nation was most solemnly pledged to make good ; and, yet, get comparatively nothing of any value for his money. This shows how reluctantly the human mind is disposed to divide out the . false goods of an old, selfish idolatry, and to do RIGHT, though the heavens may fall. It may be permitted moderately to deplore, though we can not help, such a painful departure from the *law of laws.*—Constitution of Ala. 1867, article 1, § 15 ; Hob. 224.

35. I, therefore, think that both the ordinances above referred to, are free from any clearly defined constitutional objections, and that the judgment in this case ought to be reversed and remanded.