# Berry *v*. Nall & Duxberry.

*Action to Recover Damages for Breach of Contract to Deliver Cotton.*

1.  *Amendment nunc pro tunc; when proper.*—An amendment *nunc pro tunc* should be allowed only in furtherance of justice ; it should not be allowed when its manifest operation is to work injustice.

2.  *Same.*—Where the minute entry at a former term shows that a change of venue was granted "upon condition, that before the transcript is furnished the plaintiff shall give bond and security, to be approved by the clerk, in such a sum as will cover the costs accrued in the case, *and when said bond and security is given as required*, it is ordered by the court that said cause be transferred to Russell county," &c.—an entry on the judge's docket at that term, that "on application of plaintiffs, the venue in this case is changed to Russell county, but before transcript is furnished, plaintiffs are required to give bond and security, to be approved by the clerk of the court, in such sum as will cover the costs accrued in this case," is not of itself sufficient to authorize an amendment *nunc pro tunc* at a subsequent term, changing the *venue* absolutely.

3.  *Change of venue, what waiver of.*—Where a defendant, claiming that the *venue* has been transferred to another court, moves to strike the case from the docket on that ground, and excepting to the overruling of his motion, appears in the court, where the suit was pending when the transfer was ordered, and enters upon a trial afterwards had in that court, this is a waiver of his objection and prevents his raising it on appeal.

4.  *Same; remedy in such a case.*—If the defendant intends to insist on the objection, he should treat the proceedings as *coram non judice*, taking no part therein, or apply for an appropriate writ to prohibit the court from proceeding further in the cause.

5.  *Writings ; when two instruments construed together, and constitute but one contract.*—Plaintiffs and defendant executed two writings. The first, signed by defendant B. alone and delivered to plaintiffs, was as follows : " I, the undersigned, agree to deliver to Nall & Duxberry twenty-seven bales of cotton," of certain quality at a stipulated price, "the cotton to be paid for as soon as ready for market." The plaintiffs signed another instrument of the same tenor as the foregoing, except that it was signed by the plaintiffs and not by B., but was delivered to him at the same time that he delivered the other writing to plaintiffs. *Held :* the two writings, although awkwardly drawn, to bind each party to the performance of the contract, plainly imported what that contract was, and bound each of the parties to perform the respective obligations it imposed—the one to deliver the cotton and the other to pay for it, according to contract.

6.  *Instrument ; when not inadmissible for want of a revenue stamp.*—An instrument required to be stamped under the internal revenue law of the United States, can not be rejected as evidence, merely because it is not stamped ; it must be shown that the omission to stamp was designed to avoid payment of the stamp tax.

7.  *Same.*—Where an instrument was executed at a time when there was no internal revenue collection office in the district where it was made, a party to the contract, under the laws of the United States, was authorized to affix the proper stamps at any time before the first day of January, 1867.

8.  *Price of cotton ; what competent evidence of.*—Proof of what cotton sold for at certain dates in a city, which was the market town of the locality where the cotton was to be delivered, and some thirty miles distant from it, together with proof as to the cost of hauling from that place to such market, is competent evidence to show what its value was at the same time in such locality.

[Berry v. Nall & Duxberry.]

9. *Agreement to deliver cotton; what necessary to enable party to maintain or defeat action for breach of.*—Where the seller agrees to deliver certain cotton when ready for market, for which the purchaser was to pay a certain price, and notifies the buyer that it will be ready for delivery at a certain time, at which time the buyer appears to receive it—the seller can not absolve himself from liability for non-delivery, by showing that the buyer was not then ready to pay for it, if he, the seller, was not then able to deliver according to contract, and the buyer, demanding delivery, was ready and able to comply when such delivery could be made.

10. *Same; buyer's option.*—A purchaser agreed to buy a number of bales of cotton when ready for market, for which he was to pay for a given number "twenty-five cents in gold," and for the remainder "at thirty-seven cents in greenbacks." The discount between "greenbacks" and gold, both then and at the time delivery was demanded, was quite heavy. *Held:* the stipulation was a privilege enuring to the buyer, and his whole duty and more under the contract, would be performed in paying dollar for dollar in coin, instead of "greenbacks," for the cotton which it was agreed he might pay for in "greenbacks."

11. *Tender of less number of bales than was contracted for; what will not excuse.* Where a party agrees to deliver a certain number of bales of cotton, the exact weight not being specified, tender or readiness to deliver a less number of bales is not a compliance with the contract, although the bales tendered are unusually heavy.

12. *Delivery of cotton; when demand for, in time.*—The buyer of cotton, who contracted to receive and pay for a certain number of bales at so much per pound, when notified that it was ready for delivery, on a plantation, performs on his part, if he is ready, and offers to receive and pay for the cotton at the appointed place, a half hour after sunset of the last day on which he was entitled to demand delivery, if sufficient time intervenes between such demand and midnight to make proper delivery, without danger of loss or destruction to the article in handling it at such time in the night.

APPEAL from Bullock Circuit Court.

Tried before Hon. J. McCALEB WILEY.

The appellees, Nall & Duxberry, brought this action against the appellant, Martin E. Berry, in the circuit court of Pike county, on the 21st day of November, 1865, to recover damages of the latter for breach of a contract to deliver cotton. Afterwards, the portion of the county in which Berry lived having been incorporated in the territory of the county of Bullock, the venue was transferred to that county, and after several trials and mistrials had in that court, resulted, in the spring term, 1871, in a verdict and judgment in favor of plaintiffs for over nineteen hundred dollars. Nall reserved a bill of exceptions, and brings the case here by appeal, assigning for error the admission of evidence objected to by him, and the refusal to charge as requested by him, as also the giving of certain charges at the instance of plaintiff. The questions arising upon the admission of evidence, and the charges given and refused, together with the evidence relating to them, are so fully set out in the opinion, that it is unnecessary to set out the various objections in detail, or to set forth specially the charges given and refused.

[Berry v. Nall & Duxberry.]

STONE & CLOPTON, for appellant.

SAM'L F. RICE, and THOS. H. WATTS, *contra*.

MANNING, J.—This suit was brought in December, 186 5 and after two or three trials and mistrials in the circuit court of Bullock county, the plaintiffs below (appellees in this court) moved for a change of *venue*, on the ground, that by reason of the machinations of defendant they could not obtain a jury that would do them justice in that county. The motion was granted, with certain modifications or provisions; and a note, in substance as follows, was made by the circuit judge on his docket : "On application of plaintiffs the venue in this case is changed to Russell county, but before transcript is furnished, plaintiffs are required to give bond and security, to be approved by the clerk of the court, in such sum as will cover the costs accrued in this case." The entry on the minutes of the court, made at length afterwards, set forth that the motion was granted "under the following conditions, viz : that before transcript is furnished, the plaintiffs shall give bond and security, to be approved by the clerk of this court, in such sum as will cover the cost accrued in the case; *and when said bond and security is given as required*, it is ordered by the court, that said cause be transferred to Russell county," and that the clerk seal up and transmit the papers, &c.

The order was such an one as the court might modify or alter; and this entry on the minutes, which was doubtless read, as is customary, the next morning and approved as the definitive ruling of the court, on the motion to change the venue, stood thereafter as its final determination of that matter. It followed, that the plaintiffs having declined to execute the bond, in compliance with the condition, the cause remained in the court of Bullock county. But, at the second term thereafter, the parties on both sides appearing and being in court, the defendant below (appellant in this court,) moved that the minute-entry above set forth be amended; and upon the evidence afforded by the judge's note on the docket, the court ordered an amendment of the minute-entry *nunc pro tunc*, so as to make it, after a previous recital, read as follows: "On said application of plaintiffs the *venue* in this case is changed to Russell county, but before transcript is furnished, the plaintiffs are required to give bond and security, to be approved by the clerk of this court, in such sum as will cover the cost accrued in the case; *and it is ordered by the court that this cause be transferred to Russell county*, and that the clerk append to the original papers in this case, a

VOL. LIV.

transcript of all the proceedings had in said cause, and transmit the whole under seal to the clerk of the circuit court of the county of Russell."

Until this motion to amend was made and granted, the cause remained *in fact* and in law, in the circuit court of Bullock county. And the obvious purpose of appellant, in moving at the fall term, 1870, of that court, so to amend the minute-entry of the fall term, 1869, was to produce the absurd and unjust result of enabling him thereby to maintain that the cause was in fact and legally not in Bullock court at all, *and had not been since the fall term, 1869*, and thus to get rid of the suit against him, by an alteration procured by himself in an order of the court made at the instance of plaintiffs for their benefit. Of course, such an amendment *nunc pro tunc*, ought not to have been permitted by the court; first, because amendments of this sort should be allowed only to promote justice and never to produce injustice; and, secondly, because it by no means followed from the judge's note upon his docket in such a matter, that the minute-entry did not express the true final determination of the court. The terms of an order of that kind were wholly within the breast of the judge; and if, after being put into shape on the minutes of the court, a motion had been made by appellant to amend the order at the term when it was made, there is very little reason to doubt, either that this would have been refused because of the injury it might do the plaintiffs, or that they would have withdrawn their motion for a change of venue, and no order on the subject would have been made.

The minute-entry was amended, however, as above explained; and thereupon the defendant moved to have the cause stricken from the docket, as not in that court; which motion being denied, he excepted. And this refusal of the court is assigned as error.

Whether it was or not, we need not inquire. The court had jurisdiction of the subject-matter of the suit; a trial of it was afterwards had in that court, in which defendant appeared and took part, and this was a waiver of the objection that the cause was not there. If the defendant intended to insist on that proposition, he should have done so by treating the proceedings as *corum non judice*, and taking no part therein, or have applied for a writ of prohibition or some similar process to prevent them.—*Byrd v. McDaniel*, 26 Ala. 585; *Hair v. Moody*, 9 Ib. 399.

The evidence of the contract between the parties consisted of writings, of which the following is a copy: "Pine Level, October 13th, 1865. I, the undersigned, agree to deliver to

Messrs. Nall & Duxberry 27 bales of cotton (good middling) with exception of one *bale*, the same to be paid for at the following price, 22 bales at 25 cents in gold—5 bales at 37 cents in greenbacks. The cotton to be paid for as soon as it is ready for market.          (Signed)    M. E. BERRY."

This was given by defendant to plaintiffs, Nall & Duxberry. Another writing of the same tenor as the foregoing, except that it was signed by Nall & Duxberry, and not by Berry, was at the same time given by them to defendant, Berry, and both instruments were produced and proved at the trial, and read as evidence of the contract between the parties. Appellant insists that the latter writing, because it did not contain his name, did not bind plaintiffs below to pay any money to him; and that the contract, not being mutual, was not binding.   The bargain was certainly very inartificially drawn up.   But when the two instruments, identical in terms, one signed by plaintiffs and delivered to defendant, and the other signed by defendant and delivered to plaintiffs, are brought together as the evidence of their agreement, it is the same thing as if one only of the two writings had been signed by both parties and put into the hands of a common friend to be produced for the benefit of each.   And a court could have no difficulty in holding that such an instrument, signed by both parties, imported that each (although awkwardly) engaged thereby to perform his part of the agreement to the other; and that as Berry was to deliver the cotton to Nall & Duxberry, they were to pay the price stipulated for the same, to him.   The objections to the writings as evidence of the contract were, therefore, not well founded.

The same is true in respect to the objection that they were not properly stamped.   They were executed at a time when there was no internal revenue collection office in the district in which they were given; and in such case, the law authorized plaintiffs to affix, as they did, stamps to the writings any time before the first of January, 1867.—(See *McElvain v. Mudd*, 44 Ala. 48.)   And if this had not been done, yet, as the omission was not in fraud of the stamp act, they were admissible in evidence.—*Perryman v. Greenville*, 51 Ala. 507.

There was no error in allowing Nall, one of the plaintiffs, to prove that if the currency known as "greenbacks," which he had with him, was not sufficient to pay for the cotton which they agreed to pay for in greenbacks, he had gold coin enough with which he was ready and willing to make up the deficiency, dollar for dollar.   In giving evidence that plaintiffs were able and willing to perform their part of the agreement, it was certainly permissible to show also how, with what means, they were, or the witness supposed they

were, prepared to do so. If the law did not authorize them to pay in gold coin what they had promised to pay in currency, without any discount for the latter, the testimony objected to did not prevent defendant from availing himself of that point. Rather, it better enabled him to do so.

Nor was there error in allowing the plaintiffs to prove the price of cotton from the 20th of October to the 25th, in the city of Montgomery. It was in evidence, that this city was the market town for the sale of that commodity for the people of the neighborhood—about thirty miles distant—in which defendant lived and had his plantation. It was proved also what the price of hauling cotton thence to Montgomery was, and that the price of cotton remained the same there from the 20th to the 26th of that month. The data were thus furnished (probably the best obtainable), by which the jury could determine the value of the cotton at the time and place of delivery. The objections to the testimony of Nall, and afterwards to that of Peebles, about the price at Montgomery, were consequently properly overruled.

The evidence shows that cotton began to rise rapidly in price on the day after the contract sued on was made (October 13th), and continued to rise until the 20th; that on the 18th, defendant sent a note to plaintiffs admonishing them that the cotton he agreed to sell them would be ready on the 20th; that on the 19th, plaintiff Nall went to defendant and informed him that he had money enough in Montgomery (where plaintiffs lived) to pay for all the cotton, and inquired if defendant would not permit him to take so much of it as he (Nall) "had money enough with him to pay for, and afterwards to come and pay for the balance of the cotton and take such balance when thus paid for;" that defendant "refused, saying that all the cotton must be paid for before the plaintiffs could move any part of it;" that "on the evening of the 20th, about a half an hour after sunset and halfway between sundown and dark," Nall and one Collins went to the residence of defendant, called him out and told him that he (Nall) had come to receive and pay for the cotton, to which defendant said "it was no time to weigh and deliver cotton, but if said Nall had come before sundown, he, (defendant) would have delivered the cotton;" that Nall replied that defendant "had better reconsider as to that, and that he, Nall, was willing to come back early next morning, when the cotton could be weighed and he would pay for and receive it;" and that defendant answered "that the time was out, and he would not deliver the cotton on the next day or at any other time."

Nall and Collins testified that Nall had with him $3,210 in

[Berry v. Nall & Duxberry.]

gold coin and $835 in greenbacks, and that the former was then at a premium of 45 per cent. over the currency. Nall testified further, that he did not tell defendant how much money he had with him, and said he did not know how much the cotton would weigh, or whether it ever had been weighed, but that an average bale of cotton weighs 500 pounds; and in a reply to a question, he answered that if he had not greenbacks sufficient to pay for the five bales to be paid for in that currency, he had gold coin sufficient, and was able, ready and willing to make good the deficiency, dollar for dollar in the gold coin. He also said that when he called on the defendant on the 19th of October, defendant told him he had 19 bales of cotton ready.

Defendant testified that he had 19 bales of his own cotton, and to be certain to have enough he had purchased six bales from two of his sons, and that these 25 bales were more in weight than 27 bales of 500 pounds each; that all this cotton was, on the 20th of October, at the cotton screw of a neighbor, a mile and 300 yards distant from his own residence; that this neighbor had some cotton packed and lying at said screw, and some unginned cotton in his house and a pen about twenty steps from the screw; that he (defendant) had been a planter forty years, and in his opinion it was dangerous to weigh and deliver cotton at night with a light; and that when said Nall and Collins came to his gate, it was so near dark that he could not recognize them at the distance from his house to the gate. He further said that "said cotton had never been weighed," that he had borrowed scales from a neighbor to weigh the cotton, and had them at his house for a week before Nall and Collins came there on the evening of October 20th, and at that time, but did not inform plaintiffs, or either of them, that he had the scales.

The soundness or unsoundness of the objections made and exceptions taken to charges given by the court to the jury, and to refusals of the court to charge as requested, depend upon the rights and duties of the parties under the contract and the state of facts set forth in the record.

The contract in this cause was, on the part of the defendant to sell and deliver, and on the part of plaintiffs to pay on delivery. In order to entitle either party to sue, he must show that he was able and ready to perform his part of the agreement, and offered to do so in proper time. Defendant alleges, first, that plaintiffs do not show that they were able and prepared to pay; because, although they had gold coin more than enough to pay for 22 bales at 25 cents a pound, they did not have "greenbacks" enough to pay for 5 bales at 37 cents a pound, and 500 pounds to the bale, by $90. But

they had more gold coin, by $440, than was required to pay for 22 bales of 500 pounds each. In fact, they had enough gold coin to pay for 22 bales of 550 pounds each at 25 cents a pound, and leave a sufficient sum over, with the $835 of "greenbacks," to pay for 5 bales more of 550 pounds each at 37 cents a pound; and the gold coin was shown to be worth 45 cents in the dollar more than the greenback currency. Defendant's counsel contend, however, that plaintiffs must show that they had of this currency a sufficient sum to pay for the five bales, and that they were not entitled to pay for them with gold coin. Let us see.

The contract of the parties is one of sale, not of barter. It was for their value as a circulating medium, as dollars and cents, that defendant agreed to take the "greenbacks;" and they were to be taken as a *payment*, "to be paid," and not in exchange, by way of barter, for the cotton. They had become current as money. Their chief value, however, as a currency, was based upon the fact that the government promised that the sums mentioned in them should be paid in money, that is, in gold coin of the same sort as that which plaintiffs were prepared to pay to defendant. And it was the prospect that the notes called greenbacks would be convertible into such coin *at par*, that greatly conduced to the use of them in trade, as dollars, or money. But the realization of this prospect seemed then distant, and "greenbacks" were so depreciated in consequence, that men were willing to pay in them 37 cents a pound for cotton of the same quality for which 25 cents a pound in gold coin was considered a fair price. Under these circumstances, it is clear that the stipulation that the cotton for which they were to pay 37 cents a pound, should be paid for in "greenbacks," was a privilege in favor of the buyers and not of the seller. The purchasers would perform their whole duty under the contract, and more, if they should pay for a part of that cotton in gold coin, dollar for dollar, instead of in greenback currency. And the price for the cotton being a debt payable in dollars and cents, the creditor would be bound to accept payment of it, under such a contract as this, in that genuine money of the country which the constitution of the United States provides that the general government only shall coin, and of which it declares that no State shall make any thing else a legal tender in payment of debts.

It is also, secondly, contended that the offer to pay for and receive the cotton, was made at too late an hour of the last day in which plaintiffs were entitled to make it. We are not of that opinion. It is proved that it was customary to use lights in weighing cotton about gin-houses, and that there

was not much danger in doing so.  If this cotton was in a situation of much risk, in this particular, at another man's screw for packing, one mile and 300 yards from the residence of defendant, instead of on his premises where it was raised, it was his fault that it was so.  He had given plaintiffs notice that they must pay for and receive it that day.  They found him in time to have the cotton weighed, paid for and delivered long before midnight, if it had been in the proper place for this to be done.  And this, under the circumstances disclosed by this record, was sufficient.

The question about the time of day for such a delivery of bulky articles on the last day allowed by the contract, was examined at length and discussed ably in the interesting case of *Starlup v. McDonald*, in Exch. Cham. (6 Mann & Gr. 593). And in it the court held, that if the party to whom the offer is made be found after evening has set in, but in time for the performance of what is needed to be done to complete the transaction before midnight, the offer to deliver would then be good.

This question, however, and several of the others raised on behalf of appellant, are made of no consequence by important facts in this case.  Although defendant had sent to plaintiffs notice requiring them to pay for and receive the cotton on the 20th day of October, and they were ready and offered to do so at a late hour on that day, defendant was not himself then, or previously, prepared to perform his part in the transaction, and yet declared he would not deliver the cotton then or after that day, notwithstanding plaintiffs offered to pay for it and receive it at another time, when it could be weighed and examined, since defendant objected on account of the lateness of the hour.

Men can not fling off their obligations at their own pleasure. The seller in a contract of sale, whose duty it is to get the articles sold ready for delivery, and who, therefore, may designate the time when the buyer shall accept and pay for them, or lose the right to demand them afterwards—can not, by appointing a time of delivery when that duty on his part is not performed, put an end to the contract because the buyer also is not then ready to pay for the articles.  The buyer need not be ready to pay for them until they are prepared to be delivered.  In order to justify defendant in assuming to annul the contract against the will of plaintiffs, he must show, what he would be required to show in order to maintain a suit against them for non-performance of it, to-wit: that he was in a situation and ready on his part to do all that the contract required him to do, at the time appointed by himself, for the delivery of the cotton.  Without this, he can not

absolve himself from his engagements by merely repudiating them and refusing to comply with the request of plaintiffs to fulfill them on a subsequent day. And his declaration that he will not do so, made to them when they are prepared and offer to pay for the cotton upon its being weighed, examined and delivered either then or afterwards, and when he is not prepared to perform on his part—only relieves them of the necessity of making an offer again, before bringing suit. The law does not compel them to do a vain or useless thing.

Now, the contract bound defendant to deliver 27 bales of cotton, all, except one, of the quality of good middling. The bill of exceptions recites that all the evidence in the cause is therein set forth. But there is none whatever in the record showing that the cotton was of the quality stipulated; while one of the witnesses, a planter of the same county, says that cotton, of the quality of good middling, "was scarce and above the quality mostly made by planters in his region." Defendant did not, therefore, show that he was ready in this particular.

Moreover, it was also proved by defendant himself, that he had only 25 bales of cotton on the 20th of October and not 27. True, he said also, that the 25 bales "were more in weight than 27 bales of 500 pounds each." This he could not know at the time he undertook to repudiate his agreement, because he swears they had then "never been weighed." His contract was to deliver 27 and not 25 bales. If the cotton had gone down in price, instead of up, and he had 27 bales, each as heavy as the average of these 25 bales must have been to outweigh 27 of 500 pounds each, plaintiffs would have been obliged, under their contract, to take the 27 bales at the price agreed on, though much higher than the cotton was then worth, unless the overweight was so great as to appear to be the result of an unjust imposition.

In *Davis v. Adams*, (18 Ala. 264,) a planter who had agreed to deliver 50 bales of his crop of cotton, of 1847, in Montgomery at 10 cents a pound, in the following January—at which time the market price had fallen to 6¼ cents a pound—having tendered the cotton to the buyer, who refused to receive and pay for it—sued the latter for the difference between the stipulated and the market price. It appeared that the bales were of the average weight of 575 pounds each, and that the usual average weight of bales was 550 pounds. A question being thereupon made, this court said: "If the parties had agreed upon the exact weight of the bales, then a tender of bales, materially different as to the weight, would not have been a compliance with the contract. But, as the contract is silent as to the weight or quantity of cotton that

each bale should contain, we must infer that they intended the bales should be of the usual weight, without meaning to be exact. Unless, therefore, the weight of the bales so far exceeded ordinary bales, or bales of the usual weight, as to show that the plaintiff intended to gain an advantage over the defendant by reason of the change in price, the court could not say that the bales did not correspond with the contract." And not considering them excessively heavy, the court held that the buyer was bound to accept the 50 bales notwithstanding the overweight.

The same rule must be applied in favor of the buyer as of the seller. If the weight be not expressed, the buyer, as we have seen, must take the number of bales he bargained for, though they be heavier than common and the price has gone down; and it is certainly not more unjust to the planter who makes the bales, and can not intend in doing so to cheat himself, to say he must deliver the number he contracted to deliver, though they be heavier than usual and the price has gone up. In this particular also, defendant was not prepared to perform his part of the contract.

It follows, that defendant was not in condition to release himself from his contract with plaintiffs, on the pretext that their offer to pay for and demand of the cotton on the day he appointed for the delivery of it, were made at too late an hour; and he did not do so by his declarations to that effect.

The views we have expressed dispose of all the questions raised by the assignment of errors, either by answering them or by showing that some of them and the charges asked and refused, out of which they arose, must be regarded as abstract.

The judgment of the court below is affirmed.

STONE, J., not sitting.